# Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff

It is legally permissible for the President to assert executive privilege in response to a congressional subpoena for reports of Department of Justice interviews with the Vice President and senior White House staff taken during the Department's investigation by Special Counsel Patrick Fitzgerald into the disclosure of Valerie Plame Wilson's identity as an employee of the Central Intelligence Agency.

July 15, 2008

THE PRESIDENT
  THE WHITE HOUSE

Dear Mr. President:

I am writing to request that you assert executive privilege with respect to Department of Justice documents subpoenaed by the Committee on Government Reform of the House of Representatives (the "Committee").

The subpoenaed documents concern the Department's investigation by Special Counsel Patrick Fitzgerald into the disclosure of Valerie Plame Wilson's identity as an employee of the Central Intelligence Agency. The documents include Federal Bureau of Investigation ("FBI") reports of the Special Counsel's interviews with the Vice President and senior White House staff, as well as handwritten notes taken by FBI agents during some of these interviews.[1] The subpoena also seeks notes taken by the Deputy National Security Advisor during conversations with the Vice President and senior White House officials and other documents provided by the White House to the Special Counsel during the course of the investigation. Many of the subpoenaed materials reflect frank and candid deliberations among senior presidential advisers, including the Vice President, the White House Chief of Staff, the National Security Advisor, and the White House Press Secretary. The deliberations concern a number of sensitive issues, including the preparation of your January 2003 State of the Union Address, possible responses to public assertions challenging the accuracy of a statement in the address, and the decision to send Ms. Plame's husband, Ambassador Joseph Wilson, to Niger in 2002 to investigate Iraqi efforts to acquire yellowcake uranium. Some of the

---

[1] Although the subpoena also sought the FBI report of the Special Counsel's interview with you, the Committee has effectively suspended that portion of the subpoena. *See* Letter for Michael B. Mukasey, Attorney General, from Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform at 1 (July 8, 2008) ("July 8 Committee Letter") ("[T]he Committee will not seek access to the report of the FBI interview of President Bush at this time."). Accordingly, the report of your interview is not among the materials over which I am requesting that you assert executive privilege.

subpoenaed documents also contain information about communications between you and senior White House officials.

The Department has made substantial efforts to accommodate the Committee's oversight interests concerning the Plame matter by producing or making available for the Committee's review a large number of FBI reports of interviews with senior White House, State Department and Central Intelligence Agency officials. In view of the heightened confidentiality interests attendant to White House deliberations, we consider our willingness to make the reports of interviews with senior White House staff available for the Committee's review, subject to limited redactions, to be an extraordinary accommodation. On June 24, 2008, we informed the Committee that we anticipate offering to make the remaining reports of interviews with senior White House staff available for Committee review on the same basis as the reports previously reviewed by Committee staff. *See* Letter for Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform, from Keith B. Nelson, Principal Deputy Assistant Attorney General, Office of Legislative Affairs at 1 (June 24, 2008) ("June 24 Department Letter"). The only reports the Department has not expressed a willingness to make available for review are those for the interviews of you and the Vice President, because of heightened separation of powers concerns.

Despite these substantial efforts at accommodation, the Committee insists that the Department provide it with unredacted copies of all of the subpoenaed documents except your interview report. In my view, such a production would chill deliberations among future White House officials and impede future Department of Justice criminal investigations involving official White House conduct. Accordingly, for the reasons discussed below, it is my considered legal judgment that it would be legally permissible for you to assert executive privilege with respect to the subpoenaed documents, and I respectfully request that you do so.

# I.

It is well established that the doctrine of executive privilege protects a number of Executive Branch confidentiality interests. Preserving the confidentiality of internal White House deliberations related to official actions by the President lies at the core of the privilege. *See, e.g.*, *In re Sealed Case*, 121 F.3d 729, 752–53 (D.C. Cir. 1997) (addressing presidential communications component of executive privilege); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 1–2 (1999) (opinion of Attorney General Janet Reno) (same). As the Supreme Court recognized in *United States v. Nixon*, 418 U.S. 683 (1974), there is a

> necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alterna-

tives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These . . . considerations justify[] a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Id.* at 708.

Executive privilege also extends to all Executive Branch deliberations, even when the deliberations do not directly implicate presidential decisionmaking. As the Supreme Court has explained, there is a "valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion." *Nixon*, 418 U.S. at 705; *see also Assertion of Executive Privilege With Respect to Prosecutorial Documents*, 25 Op. O.L.C. 1, 2 (2001) (opinion of Attorney General John D. Ashcroft) ("The Constitution clearly gives the President the power to protect the confidentiality of Executive Branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. at 2 (explaining that executive privilege extends to deliberative communications within the Executive Branch); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 30 (1981) (opinion of Attorney General William French Smith) (assertion of executive privilege to protect deliberative materials held by the Department of Interior).[2]

Much of the content of the subpoenaed documents falls squarely within the presidential communications and deliberative process components of executive privilege. Several of the subpoenaed interview reports summarize conversations between you and your advisors, which are direct presidential communications. Other portions of the documents fall within the scope of the presidential communications component of the privilege because they summarize deliberations among your most senior advisers in the course of preparing information or advice for presentation to you, including information related to the preparation of your 2003 State of the Union Address and possible responses to public assertions that the

---

[2] The Justice Department's long-standing position finds strong support in various court decisions recognizing that the deliberative process privilege protects internal government deliberations from disclosure in civil litigation. *See, e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) ("Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions."); *Landry v. FDIC*, 204 F.3d 1125, 1135–36 (D.C. Cir. 2000) (describing how agencies may assert the "deliberative process" component of executive privilege in litigation); *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 573–74 (D.C. Cir. 1990) (describing the "'deliberative process' or 'executive' privilege" as an "ancient privilege . . . predicated on the recognition that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl") (internal quotation marks omitted).

address contained an inaccurate statement. In addition, many of the documents summarize deliberations among senior White House officials about how to respond to media inquiries concerning the 2003 State of the Union Address and Ambassador Wilson's trip to Niger. Such internal deliberations among White House staff clearly fall within the scope of the deliberative process component of the privilege. As the Supreme Court explained, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705.

Moreover, because the subpoenaed documents are from law enforcement files, the law enforcement component of executive privilege is also implicated. The President may invoke executive privilege to preserve the integrity and independence of criminal investigations and prosecutions. *See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 75–78 (1986) ("*Independent Counsel Act*") (explaining the Executive Branch's authority to withhold open and closed law enforcement files from Congress); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 117 (1984) ("Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature."); *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 32–33 (1982) (same concerning law enforcement files of the Environmental Protection Agency); *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 49 (1941) (same concerning investigative files of the Federal Bureau of Investigation). Although the law enforcement component of executive privilege is more commonly implicated when Congress seeks materials about an open criminal investigation, the separation of powers necessity of protecting the integrity and effectiveness of the prosecutorial process continues after an investigation closes. *Independent Counsel Act*, 10 Op. O.L.C. at 77. The Department has long recognized that executive privilege protects documents related to a closed criminal investigation where disclosure might "hamper prosecutorial decision-making in future cases" or undermine the Executive Branch's "long-term institutional interest in maintaining the integrity of the prosecutorial decision-making process." *Id*.

Even though the Special Counsel's investigation and the Libby prosecution are closed matters, the law enforcement component of executive privilege is applicable here because the Committee's subpoena raises serious separation of powers concerns related to the integrity and effectiveness of future law enforcement investigations by the Department of Justice. I have a general concern about the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly

politicized issues in public committee hearings. More specifically, I am concerned about the subpoena's impact on White House cooperation with future Justice Department criminal investigations. As the Department has explained to the Committee, there "is an admirable tradition, extending back through Administrations of both political parties, of full cooperation by the White House with criminal investigations." June 24 Department Letter at 2. In keeping with this tradition, you, the Vice President and White House staff cooperated voluntarily with the Special Counsel's investigation, agreeing to informal interviews outside the presence of the grand jury. Were future presidents, vice presidents or White House staff to perceive that such voluntary cooperation would create records that would likely be made available to Congress (and then possibly disclosed publicly outside of judicial proceedings such as a trial), there would be an unacceptable risk that such knowledge could adversely impact their willingness to cooperate fully and candidly in a voluntary interview. They might insist, alternatively, on disclosing information only pursuant to a grand jury subpoena in order to ensure the secrecy protections of Rule 6(e) of the Federal Rules of Criminal Procedure. Thus, if the Department were to release copies of interview reports with the Vice President or senior White House staff, this precedent could discourage voluntary cooperation with future Department criminal investigations involving official White House actions. Such a result would significantly impair the Department's ability to conduct future law enforcement investigations that would benefit from full White House cooperation.

Accordingly, for the reasons discussed above, I believe that the subpoenaed materials fall within the scope of executive privilege.

## II.

Under controlling case law, a congressional committee may overcome an assertion of executive privilege only if it establishes that the subpoenaed documents are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). Those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution."). The Committee has not satisfied this high standard.

The Committee asserts that it needs the subpoenaed documents "to answer important questions about how the White House safeguards national security secrets and responds to breaches, and to make legislative recommendations to ensure appropriate handling of classified information by White House officials." July 8 Committee Letter, *supra* note 1, at 6. The Department has acknowledged that the Committee may have legitimate oversight interests in this area. *See, e.g.*,

June 24 Department Letter at 1, 3 (summarizing the Department's efforts to accommodate the Committee's interests).

It is not sufficient, however, for the Committee to assert that the subpoenaed documents may, at some level, relate to a legitimate oversight interest. To overcome an assertion of executive privilege, a congressional committee must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Senate Select Comm.*, 498 F.2d at 733. In this sense, the D.C. Circuit has emphasized, "[t]here is a clear difference between Congress's legislative tasks and the responsibility of a grand jury." *Id.* at 732. "While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Id.*; *see also Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

The Committee has yet to identify any specific legislative need for the subpoenaed documents, relying instead on a generalized interest in evaluating the White House's involvement in the Plame matter as part of its review of White House procedures governing the handling of classified documents. The Department has already made extensive efforts to accommodate this interest. Among other steps, the Department has produced or made available for the Committee's review dozens of FBI reports of interviews with senior White House staff and State Department and Central Intelligence Agency officials. Indeed, with the exception of the Vice President's interview report (and yours), the Department has made available for the Committee's review, or indicated it anticipates making available for review, all of the interview reports subpoenaed by the Committee, subject to limited redactions to protect presidential communications and irrelevant personal information. In the Department's view, these accommodations, combined with the voluminous record from the Libby trial, should satisfy the Committee's legitimate interests.

The only subpoenaed document that the Committee addresses with any particularity is the Vice President's interview report, which the Department has not made available for review because of heightened separation of powers concerns. Despite repeatedly referencing the report, however, the Committee never articulates any legitimate legislative interest in the document that might outweigh an executive privilege claim. Instead, the Committee simply reiterates its general interest in White House procedures for handling classified information, July 8 Committee Letter at 6, and broadly asserts that "this Committee and the American people are entitled to know" about the Vice President's conduct in the Plame matter, *id.* at 2.

These general assertions fall well short of the "demonstrably critical" particularized need required to overcome an executive privilege claim. The Department

has already accommodated any legitimate interest the Committee may have in specifically understanding the Vice President's actions. Interview reports and other documents produced or made available to the Committee describe the Vice President's role in the Plame matter, including his involvement in responding to Ambassador Wilson's article about his trip to Niger and allegations that your State of the Union Address contained an inaccurate statement. Numerous public materials, including testimony and exhibits introduced at the Libby trial, also discuss the Vice President's participation in the matter. Much of the information in the Vice President's interview report is cumulative, and therefore not "demonstrably critical" to the Committee's legislative functions. *See Senate Select Comm.*, 498 F.2d at 731–32. And, even assuming that some of the information is not duplicative, the Committee still has not explained the compelling legislative need that requires it to understand all of the details of the Vice President's involvement in the matter. *See id.* at 732 (explaining that legitimate legislative functions rarely require a "precise reconstruction of past events").

Moreover, Congress's legislative function does not imply a freestanding authority to gather information for the sole purpose of informing "the American people." July 8 Committee Letter at 2. Article I of the Constitution does not explicitly vest Congress with an "informing function," and the only informing function of Congress implied under Article I, its oversight function, "is that of informing itself about subjects susceptible to legislation, not that of informing the public." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) (citing *Hutchinson v. Proximire*, 443 U.S. 111, 132–33 (1979)).

Accordingly, when I balance the Committee's attenuated legislative interest in the subpoenaed documents against the Executive Branch's strong interest in protecting the confidentiality of its internal deliberations and protecting the integrity of future criminal investigations by the Department, I conclude that the Committee has not established that the subpoenaed documents are "demonstrably critical to the responsible fulfillment" of the Committee's legitimate legislative functions. *Senate Select Comm.*, 498 F.2d at 731.

### III.

I am greatly concerned about the chilling effect that compliance with the Committee's subpoena would have on future White House deliberations and White House cooperation with future Justice Department investigations. For the reasons set forth above, I believe that it is legally permissible for you to assert executive privilege with respect to the subpoenaed documents. I respectfully request that you do so.

MICHAEL B. MUKASEY
*Attorney General*