Irving Kirschenbaum, J.
Proceedings bearing index numbers 18656/75 and 18869/75 are consolidated for the purpose of disposition pursuant to oral application of the respondents and consent of the petitioners.
In respective article 78 proceedings, petitioners, law secretaries to the Judges of the Civil Court of the City of New York, and the Civil Court Judges themselves, seek an annulment of a determination of the respondent, Richard J. Bartlett, State Administrative Judge (Judiciary Law, § 235), eliminating the position of law secretary to the Civil Court Judges. Since each of the 120 Civil Court Judges has heretofore been entitled to appoint a personal law secretary, 120 such positions are scheduled to be eliminated by the determination now *396 under review. The respondent Bartlett has indicated an intention of offsetting the loss of these positions by the creation of a pool of 40 law assistants. Petitioners also seek to compel the respondents Mayor, Finance Administrator, Board of Estimate, City Council, Director of the Budget, Comptroller and City of New York (municipal respondents) to continue to compensate each of the Civil Court law secretaries for service in that position.
Specifically at issue in these proceedings are (1) the September 26, 1975 adoption of a resolution[1] ("resolution”) of the Administrative Board of the Judicial Conference which purportedly eliminated the position of Civil Court law secretary; and (2) the budgetary role of the municipal respondents in connection with the purported elimination of that position.
Pursuant to the specified resolution, by correspondence dated October 27, 1975, the office of Court Administration informed the respective Civil Court law secretaries that their positions would be terminated as of the close of business November 21, 1975.
The petitioners, in support of their applications, allege, inter alia, that (1) the position of law secretary to Judge of the Civil Court was created by the New York State Legislature, *397 through statutory authorization extended to the respective Judges of the Civil Court, to appoint a "personal assistant”— commonly referred to as a "law secretary”[2] — and such power of appointment cannot be impaired or eliminated by the respondents; (2) by virtue of the specified legislative mandate the municipal respondents are required to make budgetary appropriations sufficient to compensate the Civil Court law secretaries; (3) the New York City expense budget for the fiscal year 1975-1976 included the sum of $2,468,160 for the compensation of 120 Civil Court law secretaries, and since that appropriation has never been lawfully deleted, the respondents are now required to pay the salaries so appropriated for the Civil Court law secretaries; and (4) in failing to pay to the Civil Court law secretaries the salary appropriated in the 1975-1976 fiscal budget for that position, and in making payment out of funds so appropriated for the salaries of Civil Court law secretaries to pay salaries of nonjudicial personnel occupying positions other than those created by statute, the municipal respondents would be violating duties expressly enjoined by statute.
Respondent Bartlett contends that the Administrative Board acted within the scope of its authority in adopting the resolution. The municipal respondents contend that in accordance with budgetary requirements, all necessary steps have been taken to lawfully effectuate that resolution.
In support of their argument that the Civil Court Judges’ power to appoint personal assistants is inviolate, the petitioners principally rely upon section 222 of the Judiciary Law, which provides: "Wherever, under the provisions of any law heretofore adopted, a judge or justice of the unified court system is authorized to appoint personal assistants to render to him legal or clerical services, the power of such judge or justice to make such appointments shall continue, notwithstanding the provisions of section two hundred fourteen of this chapter, in accordance with the standards and administrative policies adopted by the administrative board pursuant to the provisions of section two hundred twelve of this chapter and subject to the final determination of budgets by appropriating bodies as provided in section twenty-nine of article six of the constitution. Should a judge or justice die, or cease to hold office, the personal assistants thus appointed by him shall *398 continue in office until an appointment shall be made under this section by the judge or justice elected, or appointed to fill such vacancy. The judge or justices of the court, or a majority of them shall, until the appointment or election of such succeeding judge or justice, regulate, determine and fix the duties of any such personal assistant thus continued in office.”
The predecessor courts to the Civil Court of the City of New York were the City Court of the City of New York and the Municipal Court of the City of New York. The former City Court Act authorized the Justices of that court to appoint secretaries as follows: "Each justice shall appoint his own secretary who shall serve during his pleasure.” (NY City Ct Act, § 8.) Similarly, the former Municipal Court Code provided: "There shall also be a clerk to each justice of such court. Such clerk shall be appointed by such justice and shall hold office during the pleasure of such justice.” (NY City Mun Ct Code, § 7-a, subd 9.)
Justices of the City Court and Municipal Court, upon the abolition of those courts, were- simultaneously designated as Judges of the successor Civil Court, and it has been held that Judges of the Civil Court, as successors to the Justices of the City Court and Municipal Court, retained the authority to appoint personal assistants pursuant to section 222 of the Judiciary Law. (Cohen v City of New York, 42 Misc 2d 871, affd 22 AD2d 854.) Section 222 of the Judiciary Law, however, contains two qualifications to this judicial power of appointment, inasmuch as that exercise of power must be (1) "in accordance with the standards and administrative policies adopted by the administrative board pursuant to the provisions of section two hundred twelve of this chapter” and, (2) "subject to the final determination of budgets by appropriating bodies as provided in section twenty-nine of article six of the constitution”.
Considering these two qualifications in inverse order, the "final determination” to be made with regard to budgets by appropriating authorities refers to a final determination or approval of "units of appropriation” for the respective courts, rather than to specific line items of positions, salaries, etc. Thus, with respect to the formulation of the city budget, each departmental head, and the respondent Bartlett on behalf of the city court system, is required to submit to the city and the Director of the Budget an estimate of fiscal requirements. These estimates include units of appropriation supported by *399 schedules containing line items showing how the unit totals are arrived at. The Mayor then prepares a budget for submission to the City Council, as well as a budget message (New York City Charter, §§ 112 and 116).
Section 117 of the New York City Charter specifically provides:
"Contents of the budget and budget message. — a. There shall be included in the budget:
"1. Units of appropriation * * * b. The budget message, which shall not be deemed a part of the budget, shall include: * * * 2. Itemized information and supporting schedules of positions, salaries and other-than-personal service expenses, anticipated for the ensuing fiscal year”. (Emphasis added.)
Thus, contrary to the contention of the petitioners — since specific line items are not included in the budget — the City Council cannot be deemed to have approved or disapproved specific line items contained in the original supporting schedules for positions and salaries, i.e., 120 Civil Court law secretaries at an aggregate cost of $2,468,160 (Matter of McCoy v Mayor of City of N. Y., 73 Misc 2d 508, 512, mod on other grounds 41 AD2d 929; Matter of Serra v Procaccino, 33 AD2d 210, revd on other grounds 27 NY2d 162).
The respondent Bartlett offers the following scenario of events leading up to these proceedings. In contemplation of the city’s worsening fiscal situation the supporting schedules initially submitted to the Mayor contained certain "crisis level required savings” which reduced the total appropriation for personal services for the Civil Court by $4,423,000. Such contingent budget reduction necessarily anticipated that certain personal service lines in the schedule might have to be reduced by that sum. Although the City Council subsequently added the sum of $1,057,000 to the initial Civil Court unit of appropriation, and enacted a lump-sum budget for the Civil Court (City Charter, §§ 119, 120), a total of $3,366,000 ($4,423,-000 — $1,057,000) still had to be cut from the Civil Court budget to achieve the crisis-level savings. Parenthetically, this represented only part of the over 7 million dollars reduction initially requested by the city from the budgets of all city courts.
It was anticipated, however, that the city would receive additional funds from new revenue sources, so that a new budget reflecting city-wide court cuts of 4.8 million dollars was submitted to the Mayor. Since that budget called for moneys *400 to be taken from some courts and transferred to others, i.e., transfers of units of appropriation, a budget modification had to be approved by the Board of Estimate and the City Council (New York City Charter, § 124, subd b). On July 25, 1975, the City Council restored a lump sum of $1,625,995 to the Civil Court budget. That budget modification was predicated upon a budget request of the office of Court Administration, which included supporting schedules reflecting the elimination of 120 law secretary positions in the Civil Court. With the restoration of $1,625,995 to the Civil Court budget, a total of $1,740,-000 still remained to be cut from the Civil Court budget. That was to be accomplished by the elimination of the 120 law secretary positions. This scenario, of course, remains incomplete because, as will hereafter be discussed, the city has requested huge additional reductions in the budgets of the New York City courts, and the fiscal crisis of the city continues to unfold.
As noted above, the City Council may neither approve nor disapprove the specific line items contained in the supporting schedules, but only render a "final determination” approving units of appropriation for city departments and the courts. A mechanism for changes in schedules — such as increasing, decreasing or eliminating certain line items — is found in subdivisions a and b of section 124 of the City Charter. Pursuant to these provisions either the Mayor or the agency head may change schedules within units of appropriation. Any such change is required to be published in the City Record, with written notice thereof to be given to the Mayor and the Comptroller not less than 10 days before the effective date thereof. Within the scope of the second qualification of section 222 of the Judiciary Law, the appropriating bodies have made no final determination inconsistent with the continuation of the line item providing for the position of Civil Court law secretary. However, petitioners argue that the position of Civil Court law secretaries, unlike other nonjudicial personnel positions is statutorily mandated, and thus neither that position nor the line items of the supporting schedules in question reflecting the amounts appropriated therefor may be eliminated.
This brings us to a consideration of the first qualification of the power of appointment contained in section 222 of the Judiciary Law, namely, that the appointment be "in accordance with the standards and administrative policies adopted *401 by the administrative board pursuant to the provisions of section two hundred twelve [of the Judiciary Law]”. Section 212 of the Judiciary Law implements section 28 of article VI of the New York Constitution, which grants the Administrative Board authority and responsibility for the administrative supervision of the unified court system. While section 212 authorizes the Administrative Board to establish "standards and policies” affecting many aspects of court operation, including, inter alia, personnel practices, fiscal practices and administrative methods, at issue is whether that authority extends to the elimination of the position of Civil Court law secretary.
Respondent Bartlett argues that pursuant to sections 212 and 222 of the Judiciary Law the Administrative Board possesses such pervasive authority to establish standards and administrative policies relating to the position of Civil Court law secretary, that it may adopt an administrative policy calling for the elimination of that position. Petitioners, however, contend that although the Administrative Board, through the adoption of such standards and administrative policies may establish reasonable criteria for the appointment of Civil Court law secretaries, as, indeed, it has (22 NYCRR 20.3), the power of judicial appointment provided by section 222 of the Judiciary Law is paramount and must survive any such criteria imposed by the Administrative Board.
The judicial authorities cited by the respective parties are of little assistance in construing the specified qualification of the power of appointment contained in section 222 of the Judiciary Law. Cohen v City of New York (42 Misc 2d 871, affd 22 AD2d 854, supra) was essentially concerned only with the power of appointment, per se, and not with the scope of qualifications to that power contained in section 222 of the Judiciary Law. In Matter of Gilligan v Procaccino (21 NY2d 162) the only issue was whether the individual Supreme Court Justices or the Appellate Division was the "appropriate appointing authority” within the language of a State budget bill that required moneys to be paid wholly within the discretion of the "appropriate appointing authority.” Although the court concluded that under section 222, the individual Justices were the appropriate appointing authority, the issue of the Administrative Board’s powers to circumscribe that authority was not considered. Indeed, neither the extensive research efforts of the parties, nor the research efforts of the court have disclosed prior judicial authority which considered this issue.
*402 It has traditionally been held that the language in a legislative enactment will be construed in accordance with its plain terms and most obvious sense, without resorting to artificial or forced construction (McKinney’s Cons Laws of NY, Book 1, Statutes, § 94). An examination of the pertinent provisions of section 222 of the Judiciary Law discloses a distinction therein between the judicial power of appointment and the Administrative Board’s authority to set standards and administrative policies. Predicated upon the plain terms and the sense of section 222 of the Judiciary Law, the court concludes that the Legislature, in authorizing the Administrative Board to establish standards and administrative policies relating to the appointment of personal assistants, only intended that the Administrative Board establish qualifications and criteria for that appointment, and not such administrative policies as would abrogate the power to appoint or eliminate that position.
The predecessor statute to section 222 of the Judiciary Law had granted Justices the unbridled authority to appoint personal attendants. Although the Legislature in section 222 of the Judiciary Law prudently anticipated that the need would arise to establish minimum standards and policies regarding the appointment of personal assistants, such standards or policies undoubtedly were intended to upgrade the position, by raising levels of education and skill. If the Legislature had actually intended that the position of personal assistant be subject to such overriding administrative policy of the Administrative Board, so as to include its elimination, there would have been little need to enact section 222 of the Judiciary Law, for the power of appointment expressed therein would be largely illusory.
The Civil Court law secretaries perform services vital and necessary to the operation of the Civil Court. The State Legislature has recognized the integral place of the Judges’ law secretaries in the efficient administration of justice. The Report of the Temporary Commission on the Courts (NY Legis Doc 1958, No. 36, p 20) states in this regard: "Judges, particularly trial judges, shall be freed from wasting their energies on non-judicial matters and be able to devote their time and attention to the adjudication of the cases which come before them. They should be supplied with the necessary physical facilities, books and supplies and clerical and legal assistance, that will permit maximum concentration on judi *403 cial functions * * * Clerical, stenographic and legal assistants should be qualified for their respective jobs and should be fairly compensated. They should be supplied in adequate, but not extravagant, numbers.” Indeed, the respondent Bartlett in his answer avers that law secretaries perform important services in the court.”
The Legislature in its 1969 amendment to section 222 of the Judiciary Law extended its statutory mandate for the position of personal assistant, by providing that an appointment to the position of law secretary should even survive the death of the appointing Judge and shall continue until the successor Judge appoints his own law secretary. Thus, the Legislature explicitly indicates that such an appointment may only be terminated by the appointing Judge or by an appointment of his successor, but in no event by the Administrative Board.
Even assuming, arguendo, that the Administrative Board possessed the authority to eliminate the position of Civil Court law secretary, it has not complied with the procedural requirements of section 212 of the Judiciary Law. Section 212 unequivocally provides that the Administrative Board, in discharging its administrative authority, act "in consultation with the judicial conference * * * [to] adopt, amend, rescind and make effective standards and policies for general application throughout the state”. Admittedly, the Administrative Board has not consulted with the Judicial Conference with regard to eliminating that position.
In addition, subdivision 1 of section 212 of the Judiciary Law provides in pertinent part: "Before adopting new standards and policies which affect the non-judicial personnel, the administrative board shall give notice of the proposed new standards and policies and shall give notice of and hold a hearing at which affected employees or their representatives shall have the opportunity to submit criticisms, objections and suggestions relating to such proposed standards and policies.” Although prior to the adoption of the resolution by the Administrative Board, the plan to eliminate the position of Civil Court law secretary hardly appears to have been a well-kept secret, no notice of that proposal was given as required by subdivision 1 of section 212 of the Judiciary Law. Furthermore, no hearing, as required by subdivision 1 of section 212, was conducted by the Administrative Board prior to its adoption of the resolution. The respondent Bartlett, summarily denies that any such notice or hearing was necessary. He *404 claims that to require the Administrative Board to consult with the Judicial Conference — whose members are from courts throughout the State — on such matters would be unduly burdensome and that the hearing required in subdivision 1 of section 212 is limited only to certain unrelated civil service matters. The subject of the resolution, however, is hardly ministerial in nature, dealing as it does with a large and significant group of trained and professional court personnel who concededly performed important services in the court. It appears that if any Administrative Board determination requires "consultation with the judicial conference,” the September 21, 1975 resolution affecting 120 vital court positions would be such a determination. Furthermore, subdivision 1 of section 212 of the Judiciary Law embraces the policies adopted by the resolution, and the hearing requirements of subdivision 1 of section 212 of the Judiciary Law are a necessary prerequisite thereto (Matter of De Cicco v McCoy, 40 AD2d 732). The Administrative Board, like any administrative agency, must adhere to both procedures mandated by law as well as to its own rules (Matter of English v McCoy, 51 Misc 2d 311, mod sub nom Matter of Conlon v McCoy on other grounds, 27 AD2d 280).
Significantly, the Educational Development Corporation Inc., in a comprehensive study of management procedures employed in the New York State court system is highly critical of the Administrative Board’s ability to develop and evaluate standards and policies for the unified court system. (Educational Development Corporation Inc., State Court Mgt. Task Force, Organization Report, May 15, 1974, rev Sept. 7, 1974.) Although the Administrative Board may have improved its procedures in the year since the publication of that report, the failure of the Administrative Board to observe the explicit statutory requirements, of consulting with the Judicial Conference, providing notice and conducting public hearings prior to adopting the specified resolution, if anything, confirms the critical findings of the Educational Development Corporation.
The proposed elimination of the position of Civil Court law secretary constitutes but one of the elements of a plan evolved by respondent Bartlett in compliance with a May, 1975 request of the Mayor that the New York City court system adopt austerity budgets for the fiscal year 1975-76. As indicated above the city initially requested a reduction in funding for the city courts amounting to 4.8 million dollars. An *405 additional one million dollar reduction was thereafter projected as a result of the failure of appropriating authorities to enact certain nuisance taxes to raise revenue. On October 15, 1975, the Mayor advised respondent Bartlett that because of the city’s worsening fiscal condition, and in accordance with the city’s proposed fiscal plan to be submitted to the Municipal Assistance Corporation, the city court system would be requested to absorb an additional 7.35 million dollars annual budgetary reduction, in addition to the cuts of 5.8 million dollars (4.8 million dollars + 1 million dollars) theretofore indicated, for a total annual budget reduction of 13.15 million dollars. In response to the Mayor’s request of October 15, 1975, respondent Bartlett prepared a new list of proposed personnel and program reductions, which incorporated the substance of the previously planned reductions, thus adding new cuts to achieve a final reduction of 13.15 million dollars ("Courts in City Hit With New $7.3 million Budget Cut,” NYLJ, Oct. 16, 1975, p 1, col 2; "34 Supreme and Civil Court Judges in City to Lose Posts as a Result of $13.1 Million Cuts,” NYLJ, Oct. 21,1975, p 1, col 2).
As the petitioners cogently point out, the concerted action of the municipal respondents and the respondent Bartlett appears to threaten the independence and viability of the judicial branch of the government and to impair the constitutional separation of powers.
"In the general course of human nature, a power over a man’s subsistence amounts to a power over his will. And we can never hope to see realized in practice, the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants to the latter. The enlightened friends to good government in every State, have seen cause to lament the want of precise and explicit precautions in the State constitutions on this head.” (The Federalist No. 79.) This observation of Alexander Hamilton, made almost 200 years ago, is still viable. Its underlying philosophy resulted in the tripartite separation of government which we so readily take for granted today.
No one can deny that, under such system, the courts particularly must maintain their freedom of action. It is only in this way that they may function as a refuge for those aggrieved by arbitrary or violent acts, especially those acts committed under the guise of governmental authority. In these days of *406 congested court calendars — although this situation appears to be improving — the judiciary must, at the very least, maintain its present strength in order to continue such progress, rather than allow a reduction in manpower and facilities which will only serve to sap its strength and stymie the pursuit of justice. Should public officials neglect or refuse to comply with the reasonable requirements of the courts, it would silently erode any hope of removing the judicial system from "the taint of current municipal politics, and [from] any and every general mismanagement that may prevail in city departments” (Gunnison v Board of Educ. of City of N. Y., 176 NY 11, 22).
Even as the city recoils and staggers from the impact of its present fiscal crisis, the respondents cannot, in derogation of constitutional mandate (NY Const, art VI, § 1) preside over the decimation and liquidation of the city’s court system. (Matter of McCoy v Mayor of City of N. Y., 73 Misc 2d 508, mod 41 AD2d 929, supra; Commonwealth ex rel. Carrol v Tate, 442 Pa 45, cert den 402 US 974.) Contrary to respondents’ contentions, the fiscal power vested by the Legislature in local appropriating bodies (NY Const, art VI, § 29) must, at most and at best, be deemed to be a co-ordinate power, construed to work harmoniously with the judiciary. If such powers are construed otherwise, it would, in effect, permit the legislative and executive branches of government to invade and encroach unlawfully upon the functions and authority duly delegated by our Constitution and State laws to the judicial branch of government. The arm of government which holds the scales of justice cannot be shackled or made impotent by either restraint, circumvention or denial by another branch of government.
It is vitally important to keep in mind what the court system is and what it is not. It is not an administrative or departmental agency of the city. It constitutes an independent branch of government. What essentially distinguishes a court from a departmental and administrative agency is that under our constitutional system of separation of the three branches of government, courts represent the judicial, whereas departmental and administrative agencies constitute part of the executive branch of government (20 Am Jur 2d, Courts, § 2).
"[It is], the universally recognized rule that, except insofar as it is authorized to do so by the constitution, the legislature cannot abolish, reorganize, divide, or consolidate constitutional courts, nor alter, destroy, increase, or diminish the *407 essentials of the jurisdiction, functions, or judicial powers so conferred on them, nor abrogate or abridge their inherent powers or functions.” (21 CJS, Courts, § 122.)
The respondent Bartlett claims that the personnel and program reduction in the city court system projected to date "reflect a carefully considered choice of options from among alternatives that would have created a far more serious impact on court operations”, i.e., the closing of actual trial parts, as a result of the dismissal of personnel actually engaged in operating those trial parts. Thus, with regard to the proposed elimination of the position of Civil Court law secretary, the respondent Bartlett indicates that in order to save approximately two million dollars necessary to fund that position, it would be alternatively necessary to close 18 Supreme Court criminal trial parts, 25 Supreme Court civil trial parts, 43 Civil Court trial parts, or 22 Criminal Court trial parts. The respondent Bartlett, of course, recognized that the elimination of such trial parts would be intolerable and in this regard has specifically observed: "Closings of this magnitude would have left judges without [trial] parts to sit in and would have created a further increase in the already existing criminal and civil case backlogs. The resulting curtailment of service to the people of New York City was deemed to be incompatible with the purpose of the courts to provide fair and speedy justice.” The essential function of the court is the adjudicative process, which occurs in the various trial, appellate and Special Term parts, and although the necessary complement of nonjudicial personnel required in order for these parts to function, may be a subject of debate, presently none of the parties even suggest that the staff available to support these parts is adequate. Parenthetically, the recent proliferation of administrative elements and personnel within the unified court system (Educational Development Corporation Inc., Mgt. Task Force Organization Report, May 15, 1974, rev Sept. 6, 1974; Management and Planning Office, Office of Court Admin. Staffing Study, New York City Courts (Final Report) March 5, 1975), stands in conspicuous contrast to the increasingly depleted ranks of personnel directly involved with the primary work of the courts, deciding the rights of litigants. The various layers of this expanding administrative bureaucracy must continually be scrutinized to insure that they are serving the ultimate goals of the judiciary, rather than evolving into a self-perpetuating Leviathan with neither direction nor purpose.
*408 Patently the staff requirements of any court materially exceed the Justices themselves and their personal assistants. Such requirements include a necessary complement of court stenographers, court officers, law assistants, court clerks, etc.
That the staff reductions now planned in the New York City court system will have a devastating effect on that system is of little doubt. Indeed, the respondent Bartlett, in submitting to the Mayor a plan to achieve the 13.15 million dollar annual reduction in the New York City court system’s budgets requested by the city, stated:
"These reductions will very seriously impair the administration of justice in New York City. In some instances they will result in increased expenditures for other city agencies and in other instances, in a decrease of revenue.
"The court system already suffers from years of accumulated vacant positions remaining unfilled. Now this budget reduction plan proposes further loss of personnel by attrition, the firing of over 400 non-judicial employees and the retirement of 19 Supreme Court Justices otherwise eligible for continued judicial service. It further proposes that you refrain from filling by appointment 15 Civil Court vacancies which will exist by January 1, 1976.
"* * * A court system already plagued by intolerable delay and congestion will be forced to operate with 34 fewer judges. The remaining judges will be required to function with significantly reduced staff support. The closing of Njght Court will impact adversely on both Police and Correction. Increased delay in the disposition of civil litigation will further erode the position of the City as the commercial capital of the world with a resultant loss in tax revenue.”
The respondent Bartlett in his October 17, 1975 letter to the Mayor further observed: "It is clear that at the very least the courts should be dealt with in the same manner as the other 'life blood’ agencies — police, fire, sanitation, corrections —and the cuts should be reduced to not more than the percentage imposed upon those agencies. The courts deserve this status by reason of the critical role we play in the safety and economic strength of the community and because of our close interrelationship with other 'life blood’ agencies.”
Nevertheless, the latest projected round of budget reduction for the courts ($7.35 million) remains approximately 8% of the city court system’s expenditures (including such mandatory items as Judges’ salaries, County Clerks’ salaries and certain *409 Appellate Division costs), while the latest round of reductions for police, fire and sanitation, etc., are only about 3% of their respective expenditures. In this regard it should be noted that comprehensive studies of the criminal justice system have consistently found the court system to be substantially under-financed in comparison to the police department (NY State Comm of Investigation, Grim Justice System in City of NY— An Overview, Nov., 1974; NY City Grim Justice Plan for 1971, Grim Justice Coordinating Council).
Thus, the petitioners legitimately question whether the limited alternatives of staff reductions consistently recited by the respondent Bartlett are indeed the only alternatives available. Matter of McCoy v Mayor of City of N. Y. (supra), is directly in point, for at issue in that proceeding was whether the city could withhold funding of the Housing Part of the Civil Court, which had been mandated by statute (L 1972, ch 982; CCA, § 110). In concluding that the city was obligated to make the necessary appropriations, the court observed (73 Misc 2d, at pp 510-511):
"Clearly the question presented to this court is whether the executive branch of government, by the exercise or nonexercise of its appropriating powers can impede or frustrate the courts from realizing their lawful jurisdiction”.
"Section 29 of article VI of the Constitution of the State of New York permits the annual financial needs of the courts to be determined by the appropriate governing bodies. This power is relegated to that of review of the budget estimates submitted to it, but the capacity to review does not carry with it the power to share the responsibility of court administration (Matter of Serra v Procaccino, 33 AD2d 210, revd on other grounds 22 NY2d 162). Nor is the executive branch given concomitant inherent ability to destroy by the withholding of an appropriation (cf. Matter of Colbert v Delaney, 249 App Div 209, 216; Matter of McKinney v McGoldrick, 243 App Div 210, 213, affd 266 NY 632, rearg den 266 NY 665).
* * *
"[T]he city * * * [has] not [been] relieved of its obligation to furnish the necessary funds as required by the courts for their functioning in the proper discharge of the constitutional requirement to operate an efficient system of justice.
* * *
"The duty to fund cannot be avoided or subverted because *410 budgetary modifications or future appropriations entail some degree of discretion. * * * The limits of respondents’ discretion are constitutionally proscribed (Commonwealth ex rel. Carroll v Tate, 442 Pa 45, cert den 402 US 974, supra).
The New York City court system, as are other court systems, is increasingly required to resolve problems which are the product of a complex society, ingrained with conflicting interests. It not only represents the principal arbiter of disputes between the city’s millions of inhabitants, but constantly addresses itself to sophisticated and important litigation which is the obvious product of New York City’s preeminence as a financial capital. The conduct and procedures of the various elements of government are also the subject of constant review by the city’s courts. In addition, the almost ever-increasing pattern of criminal activity within our society has made it imperative to increase, rather than reduce, the trial capacity of the criminal justice system. (NY State Comm of Investigation, Grim Justice System in City of NY — An Overview, Nov., 1974). Unless the court, which is responsible for adjudicating the guilt or innocence of the accused, is adequately staffed and funded, there will be no effective deterrent to crime.
With increasing frequency, the executive and legislative branches of government appear to have abdicated responsibility, imposing an increased burden upon the court. As Chief Judge Charles D. Breitel recently observed in a speech to the Economic Club of New York: "It is notable that both the executive and the legislative branches, despite frequent and persisting efforts to dominate and sometimes to deride the judicial branch, often look to the courts for governmental and political redress. This paradox has been more evident in recent decades than before. While legislatures often decry judicial intervention in political matters, in a crisis they look, when it suits their needs, to the courts. This was true of the most significant episodes in the Watergate affair”. (Excerpts from Judge Breitel’s Address, NYLJ, Sept. 24, 1975, p 2, col 3.)
Even President Ford has suggested that the courts may ultimately be required to resolve the conflicting interests of all concerned if the city is unable to solve its present fiscal crisis. (Transcripts of President’s Talk in City Crisis, New York Times, Oct. 30, 1975, p 46, col 1.) Although President Ford was specifically referring to the Federal Bankruptcy Courts, as observed by Chief Judge Breitel in his address to the Eco *411 nomic Club, the two court systems are interdependent, and the impairment of the State and city court systems will necessarily impair the Federal court system.
The unified court system is under increasing pressure to increase "productivity” to meet the needs of the public. (Administration Board Adopts Standards and Goals, NYLJ, Oct. 2, 1975, p 1, col 2.) Yet, if the deep and arbitrary budgetary reductions requested by the municipal respondents are fully acceded to, the city court system will further decay and be increasingly incapable of performing its constitutional duties. (Budget Cuts for Courts Hit by City Bar, NYLJ, Nov. 5, 1975, p 1, col 2.) Furthermore, it is clear that the city’s fiscal crisis, and the litigation which it will directly and indirectly foster, will only exacerbate the burdens of this already over-burdened court system.
The independence of the judiciary is an essential element of our constitutional democracy. Such authority and power as the executive and legislative branches of government possess must be exercised in accordance with limitations imposed by the Constitution. Such limitations can be maintained in no other way than through an effective judiciary, whose obligation it is to declare all acts contrary to the tenor and requirement of the Constitution void.
In United States v Nixon (418 US 683, 704-705), the high court in commenting upon the intrinsic separation of powers within the Federal Government stated: "Notwithstanding the deference each branch must accord the others, the 'judicial Power of the United States’ vested in the federal courts by Art. Ill, § 1, of the Constitution can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto. Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government. The Federalist, No. 47, p 313 (S. Mittel ed 1938).” This concept of the separation of powers between the executive, judicial and legislative branches of government is, of course, equally applicable under our State Constitution.
We live in a time of increasing tension and rapid social change, evidenced by confusion and uncertainty. This has placed unprecedented burdens upon our system of justice. If our very way of life is to survive, our system of justice must *412 be supported and maintained. The court, alone, is called upon to pass upon actions of the executive and legislative branches. The court, alone, must pass upon the legal rights of our citizenry. The court, alone, determines the guilt or innocence of the accused. The power of the judiciary affects all elements of our society. It affects every private right and every private interest. The executive possesses no inherent ability to debilitate or to destroy the judiciary by the withholding of required appropriations. If the judiciary is rendered ineffectual and impotent, our society, which is a society of laws, cannot survive.
This court wishes to emphasize that it is neither unaware of the seriousness of the critical fiscal situation faced by the city and all of its citizens, nor unsympathetic to the difficult choices which must be made by the city. Nevertheless, throughout past crises, the work of the courts has gone on, as it must now go on, unimpaired and unhindered, in the interests of justice, and for the benefit of all. It is fundamental that our courts, the bulwark of our democratic form of society, are an intrinsic and independent branch of government, deriving their powers directly from the Constitution and the Judiciary Law of the State of New York. Therefore, the courts may not properly be directed, controlled or impeded in their functions by any other branch of government. Nothing in any emergency legislation born as a result of the city’s present dire fiscal condition nor, for that matter, in the legislative history surrounding recent court reorganization, the unified court system and the applicable constitutional amendments, is indicative of any legislative intent to destroy or impair the constitutional mandate of the judiciary. The court is the keeper of the conscience and the conscience is the Constitution. It must remain strong and independent — above the momentary storm —lest it be forever compromised.
The court, however, does not function in a vacuum, and although, when government revenues fall, it may be necessary to reduce the allocation of funds to each of the three branches of government, the judiciary must insure that it, as well as the executive and the legislative branches receive their fair share of available funds. While the city budget for the fiscal year 1975-1976 appropriates approximately 97 million dollars in tax levy funds for city court system, that represents less than 1% of the city’s over-all expenditures. The contribution of the city court system to the stability and order of our *413 society is infinitely greater than the less than 1% of city funds presently allocated for its support.
If economies and sacrifices are required of the judiciary, then the judiciary, as it always has, will make such sacrifices as are in the best interest of the public. The judiciary, however, cannot abdicate its continuing responsibility to that public, by passively accepting budget reductions regardless of their debilitating impact upon the courts. At the very least the judiciary has the right to an "accounting” from appropriating authorities so that a fair allocation of revenues may be assured.
Neither the respondent Bartlett, nor his most articulate counsel have specifically responded1 to the petitioners’ cogent observations regarding the peril faced by the court, if the presently projected reduction in judicial funding is fully implemented. Rattier the respondent Bartlett consistently confines his argument to a consideration of purportedly limited options of program and staff reductions. If the appropriating authorities have rendered any "accounting” or justification for the enormous reduction in funds to support the city court system, this court has not been made aware of it. Counsel for the municipal respondents suggested upon oral argument that an attempt should not be made to "drive a wedge” between the position of the municipal respondents and the respondent Bartlett. Petitioners, however, correctly perceive that the limited alternatives continually recited by the respondent Bartlett appear to ignore the intrinsic separation between the legislative, executive, and judicial branches of government, and that the respondent Bartlett's obligation to represent the judiciary to insure that it receives its fair share of available funds is a proper subject of review. Clearly, the full implementation of the presently projected reduction in court programs and personnel would be devastating and it has yet to be established that these reductions represent a fair allocation of available funds between the three branches of government.
Respondent Bartlett's request that this court recuse (Judiciary Law, § 14; 22 NYCRR 33.3 [c] [1]) has already been denied in a ruling from the bench, which was placed upon the record. Undoubtedly, the petitioners, as aggrieved parties have standing to maintain these proceedings (Boryszewski v Brydges, 37 NY2d 361; Matter of McCoy v Mayor of City of N. *414 Y., 73 Misc 2d 508, 510, supra; 24 Carmody-Wait, New York Practice 2d, § 147:28).
Since the petitioners have demonstrated that the respondents’ determination to eliminate the position of Law Secretary to the Civil Court is contrary to law (Judiciary Law, § 222) and was adopted without regard to statutorily mandated procedures (Judiciary Law, § 212), their applications to annul that determination are granted in all respects, and the municipal respondents are directed to continue the payment of salaries for service in that position.

. Resolution of the Administrative Board, Sept. 26, 1975:
WHEREAS the City of New York is in the midst of a fiscal crisis that has resulted in a substantial reduction of the budgets of the courts in New York City, and
WHEREAS the State Administrative Judge reported on July 3, 1975, that he was considering, among other measures * * * eliminating the position of law secretary in the New York City Civil Courts while augmenting the pool of law assistants in that court, and
WHEREAS the alternative to the elimination of these positions would be the closing of court parts throughout the City by the reduction of staff that serves these parts, and
WHEREAS the Administrative Board has determined that the closing of court parts.and having judges with no courts in which to serve would be more detrimental to the effective operation of the courts in the unified court system than would the impairment of the judicial function resulting from the elimination of these positions, it is hereby
RESOL VED that as a response to budgetary problems in the courts the Administrative Board of the Judicial Conference directs that law secretary positions in the New York City Civil Court * * * be eliminated.
This is to certify that the Administrative Board of the Judicial Conference unanimously adopted the foregoing Resolution on September 26, 1975.
Dated: Oct. 15, 1975 New York, New York
s/_
RICHARD J. BARTLETT
State Administrative Judge

. "Personal assistant” and "law secretary” are used synonymously throughout this decision.