FEDERAL DEPOSIT INSURANCE
CORPORATION, Receiver for Central
Texas Savings & Loan Association
Plaintiff,

v.

John A. WHITE, et al. Defendants.

No. 3–96–CV–0560–BD.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 14, 1999.

Andrew F. Emerson, Law Offices of Richard C., Jaramillo & Associates, P.C., Dallas, TX, for Plaintiff.

Kevin F. Kurtz, Dallas, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

KAPLAN, United States Magistrate Judge.

Plaintiff Federal Deposit Insurance Corporation has filed a motion to enforce a settlement agreement entered into between the parties to this litigation at the conclusion of a post-trial mediation. Defendants John A. White and Donna A. White have filed a cross-motion to set aside the settlement agreement. For the reasons stated herein, plaintiff's motion is granted and defendants' motion is denied.

### I.

The FDIC sued the Whites for violations of the Texas Uniform Fraudulent Transfer Act and civil conspiracy. Following a five-day trial, the jury returned a verdict in favor of the FDIC and against the Whites. The Court then ordered the case to mediation. Hesha Abrams was appointed to serve as the mediator. All parties and their attorneys were ordered to attend the mediation "and proceed in good faith in an effort to settle this case." ORDER OF REFERRAL FOR MEDIATION, 9/2/99. The mediation was held on September 29, 1999. After a full day of negotiations, a settlement was reached and memorialized in a written agreement. The

Court subsequently ordered the parties to submit the settlement papers and an agreed judgment by October 29, 1999. *See* ORDER, 9/30/99.

One day before these documents were due, the Whites repudiated the settlement agreement. The Whites allege that, "throughout the mediation, [ ] they were threatened with criminal prosecution by the FDIC by and thru its representative, Andrew Emerson." (Def. Motion at 1). As a result, the Whites contend that the settlement agreement was coerced and should be set aside. The FDIC maintains the agreement should be enforced according to its terms. Both parties were given an opportunity to brief the issues and present additional evidence and argument at a hearing on December 3, 1999. This matter is now ripe for determination.

## II.

The Whites rely on their own affidavits and the testimony of their former attorneys in order to prove that the settlement agreement was coerced.[1] These affidavits purport to detail the substance of certain comments made by the mediator and FDIC representatives during the mediation. The FDIC argues that this evidence is inadmissible because "mediation communications are privileged." (Plf. Motion to Strike ¶ 4).

The applicability of evidentiary privileges in federal court is governed by Rule 501 of the Federal Rules of Evidence. This rule provides, in relevant part:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules

prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience.

FED. R. EVID. 501. The FDIC contends that Congress created a "mediator privilege" as part of the Alternative Dispute Resolution Act of 1998 ("ADRA"), Pub.L. No. 105–315, 112 Stat. 2993. The ADRA directs federal district courts to enact local rules requiring litigants in civil cases to "consider the use of an alternative dispute resolution process at an appropriate stage in the litigation." *Id.*, 112 Stat. 2994, § 4(a), *codified at* 28 U.S.C. § 652(a). Such local rules must "provide for the confidentiality of the alternative dispute resolution processes and [ ] prohibit disclosure of confidential dispute resolution communications." *Id.*, 112 Stat. 2995, § 4(d), *codified at* 28 U.S.C. § 652(d). In furtherance of this mandate, the Civil Justice Expense and Delay Reduction Plan for the Northern District of Texas has been amended to provide for the confidentiality of ADR procedures. The Plan now provides that:

[a]ll communications made during ADR procedures are confidential and protected from disclosure and do not constitute a waiver of any existing privileges and immunities.

U.S. DISTRICT COURT, NORTHERN DISTRICT OF TEXAS, CIVIL JUSTICE EXPENSE AND DELAY REDUCTION PLAN § 3(f) (revised January 1999).[2]

Confidential information disclosed to a Mediator by the parties or by witnesses in the course of the mediation may not be divulged by the Mediator. All records, reports, or other documents received by the mediator while serving in that capacity must be confidential. The Mediator shall not be compelled to divulge such records or testify in regard to the mediation in any adversary proceeding or judicial forum.

\* \* \* \* \* \*

The parties shall maintain the confidentiality of the mediation and shall not rely on, or

---

**1.** Rosa Orenstein represented John A. White at trial and attended the mediation in an advisory capacity. Donna A. White was separately represented by Michael Miner at trial and the mediation. Although both attorneys were subsequently discharged by their clients, they executed affidavits in support of the motion to set aside the settlement agreement. Michael Miner also testified at the evidentiary hearing on December 3, 1999.

**2.** The Order of Referral for Mediation also contains a confidentiality provision:

■ It is obvious that Congress sought to protect communications made during the course of mediation from unwarranted disclosure. "Confidentiality is critical to the mediation process because it promotes the free flow of information that may result in the settlement of a dispute." *In re Grand Jury Subpoena,* 148 F.3d 487, 492 (5th Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999), *citing* K. Feinberg, *Mediation—A Preferred Method of Dispute Resolution,* 16 PEPP. L. REV. S5, S28–29 (1989). However, "confidential" does not necessarily mean "privileged." *Id., citing Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1205 (9th Cir. 1975). Privileges are not lightly created and cannot be inferred absent a clear manifestation of Congressional intent. *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). The Court does not read the ADRA or its sparse legislative history as creating an evidentiary privilege that would preclude a litigant from challenging the validity of a settlement agreement based on events that transpired at a mediation.[3] Indeed, such a privilege would effectively bar a party from raising well-established common law defenses such as fraud, duress, coercion, and mutual mistake. It is unlikely that Congress intended such a draconian result under the guise of preserving the integrity of the mediation process. Certainly, the Court did not intend such a result by its order. *See also Fields–D'Arpino v. Restaurant Associates, Inc.,* 39 F.Supp.2d 412, 418 (S.D.N.Y.1999) (ADRA does not make mediation communications privileged).

For these reasons, the FDIC's motion to strike is denied. The Court will allow the Whites and their former attorneys to testify about statements made at the mediation.

### III.

John A. White and Donna A. White allege that they were threatened with criminal prosecution throughout the mediation. According to John White:

On the date of the mediation, Attorney for the FDIC, Andrew Emerson, began the session with statements of not-so-subtle innuendos that I was in dire jeopardy of losing my freedom; however, if I would agree and pay the certain "agreed upon" amounts on time; that, while he could not promise me immunity, he would advise the Justice Department that the FDIC was only interested in the money being paid and not in me going to jail. Throughout the entire proceedings and particularly on the date of the mediation, I felt that it was being communicated to me by the representative of the FDIC that if I did not agree to the settlement, the FDIC would take further action through the Justice Department in the form of criminal prosecution.

(Def.Motion, Exh. B). Donna White testified that she was frightened and intimidated by the prospect of going to jail. She stated that "time and time again, the mention of criminal prosecution was brought up" at the mediation. On one occasion, the mediator told Donna that "one of the worse case scenarios could be that I might be put into a position where I might be offered immunity from jail if I would testify against my husband." Donna said that

---

introduce as evidence in any arbitration or other proceeding: (a) views expressed or suggestions made by another party with respect to a possible settlement of the dispute; (b) admissions made by another party in the course of the mediation proceedings; (c) proposals or views expressed by the Mediator; or (d) the fact that another party had or had not indicated a willingness to accept a proposal for settlement made by the Mediator.

ORDER OF REFERRAL FOR MEDIATION, App. 1 (Rules for Mediation).

**3.** The legislative history contains only a passing reference to the confidentiality provisions of the ADRA. At one point during the debate, the sponsor mentioned that "[t]he bill also provides for the confidentiality of the alternative dispute resolution process and prohibits the disclosure of such confidential communications." 144 CONG. REC. H10457–01 (October 10, 1998) (statement of Rep. Coble).

she "felt coerced into signing the Settlement Agreement just to keep from going to jail." (*Id.*, Exh. C). Rosa Orenstein, counsel for John White, confirmed that the issue of criminal prosecution was discussed at the mediation. (*Id.*, Exh. D).

### A.

■ The threat of criminal prosecution may constitute duress whether or not the threatened party is actually guilty of a crime. *Sims v. Jones,* 611 S.W.2d 461, 462 (Tex.Civ.App.—Dallas 1980, no writ); *Pierce v. Estate of Haverlah,* 428 S.W.2d 422, 425 (Tex. Civ. App.—Tyler 1968, writ ref'd n.r.e). As one court stated:

It was never contemplated in the law that either the actual or threatened use or misuse of criminal process, legal or illegal, should be resorted to for the purpose of compelling the payment of a mere debt, although it may be justly owing and due, or to coerce the making of contracts or agreements from which advantage is to be derived by the party employing such threats. Ample civil remedies are afforded in the law to enforce the payment of debts and the performance of contracts, but the criminal law and the machinery for its enforcement have a wholly different purpose, and cannot be employed to interfere with that wise and just policy of the law that all contracts and agreements shall be founded upon the exercise of the free will of the parties, which is the real essence of all contracts.

*Greene v. Bates,* 424 S.W.2d 5, 9 (Tex.Civ. App.—Houston [1st Dist.] 1968, no writ), *quoting Hartford Fire Insurance Co. v. Kirkpatrick,* 111 Ala. 456, 20 So. 651, 654 (1896). *See also* RESTATEMENT (FIRST) OF CONTRACTS § 493, cmt. c (1932). Of course, duress is an affirmative defense that must be proved by the party seeking to avoid an otherwise valid contract. *Greene,* 424 S.W.2d at 8. The critical inquiry is whether the party was induced to enter into the contract by the threat of criminal prosecution. *Id.*

### B.

The evidence shows that the Whites were concerned about their potential criminal exposure long before mediation. And for good reason. David Groveman, in-house counsel for the FDIC, testified that a criminal referral had already been made before the case proceeded to trial in August 1999. Groveman told the Whites, though their attorneys, that "[s]aid referral once made is the province of the FBI and U.S. Attorney, not the FDIC." (Hearing Exh. 1). He reiterated this point several times both prior to and during the mediation. Still, Groveman maintained that the FDIC was only interested in getting paid. It was in this context that the mediator raised the issue of criminal liability. Although this subject was fully and openly discussed by the parties throughout the mediation, no overt or subtle threats were ever made by the FDIC or the mediator. In fact, it was *the Whites* who asked for a non-prosecution agreement during the course of settlement negotiations. They agreed to the settlement even after their request was rejected by the FDIC.[4]

■ The Court finds that the settlement agreement between the FDIC and the Whites was not the result of duress or coercion. Accordingly, the agreement will be enforced as written. *See Bell v. Schexnayder,* 36 F.3d 447, 449 (5th Cir.1994).

### IV.

The written agreement signed by the parties at the conclusion of the mediation requires the Whites to execute certain documents in furtherance of the settlement.

---

4. John White states that he did not sign the settlement agreement "freely and voluntarily." (Def.Motion, Exh. B). Rather, he "did so with the feeling of some fear of prosecution by the FDIC if I did not sign the Agreement." (*Id.*). Donna White makes similar statements in her affidavit. (*Id.*, Exh. C). The Court finds this testimony not credible in light of the context in which the issue of criminal prosecution was discussed. Moreover, the jury found that the Whites engaged in multiple acts of fraudulent conduct. (*Id.*, Exh. A). This finding further impugns their credibility.

These include: (1) an agreed final judgment in this case; (2) an agreed judgment in John White's pending bankruptcy; and (3) a promissory note in the principal sum of $1 million with a graduated payment schedule. (Hearing Exh. 2). Copies of these documents are attached to the FDIC's motion to enforce the settlement agreement. (Plf. Motion, Exh. B, C & D).[5] John A. White and Donna A. White are hereby ordered to sign each document where indicated and return them to counsel for the FDIC by *December 30, 1999.* An agreed final judgment, signed by the parties and their attorneys, must be hand delivered to the chambers of Magistrate Judge Kaplan by *January 7, 2000.*

The failure to comply with this order will subject the offending party to monetary sanctions and a possible contempt citation.

SO ORDERED.

---

5. The Whites do not object to the settlement documents as drafted. Nor do they contend that the documents misstate the terms of settlement as memorialized by the parties after the mediation. The only explanation offered by the Whites for their refusal to sign the documents is that the settlement itself was coerced.