# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 19, 2000 Session

## STATE OF TENNESSEE v. LORI A. LITTLE

**Appeal from the Criminal Court for Davidson County**
**No. 98-A-196     Walter Kurtz, Judge**

---

**No. M1999-0858-CCA-R3-CD - Filed November 22, 2000**

---

The Defendant, Lori A. Little, was convicted of two counts of forgery, both Class E felonies. In this appeal as of right, she argues (1) that the trial court improperly denied her the court's subpoena power prior to trial; (2) that the evidence was insufficient to support her convictions; (3) that the trial court improperly instructed the jury regarding NationsBank's obligations under the Uniform Commercial Code to reimburse customers for forgeries paid out of customers' accounts; (4) that the trial court improperly limited cross-examination of a prosecution witness regarding his bias; (5) that the jury was improperly tainted or biased by contact between a witness and a juror who were acquaintances; and (6) that the trial court intimidated the Defendant in a jury-out hearing during her direct examination at trial. We find no reversible error; thus, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

W. Casey Reed, Nashville, Tennessee, for the appellant, Lori A. Little.

Paul G. Summers, Attorney General and Reporter; Marvin E. Clements, Jr., Assistant Attorney General; Victor S. Johnson, District Attorney General; and Grady Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In March of 1997, the Defendant worked as a teller for NationsBank. She lived two houses down from Vernon Allen, who had a checking account and a savings account at NationsBank. Mr. Allen testified that about three or four months prior to March of 1997, his youngest son, Cary Allen, sued the Defendant for damage caused by the Defendant's horses and received a judgment for $145.00 against the Defendant. After Cary Allen received the judgment against the Defendant, the Defendant's horses again "got out" while the Defendant was out of town, and Cary Allen attempted

to have one of the horses removed from the property.  The Defendant subsequently initiated charges against Cary Allen for stealing her horse, but the charges were dismissed when proof established that the Defendant was not the true owner of the horse.

Mr. Allen testified that when his wife was balancing the checkbook at the end of March 1997, she discovered that a counter check had been written for $200.00.  The counter check was not in Mr. Allen's handwriting.  The bank statement also showed that there was a service charge on the checking account, indicating that the balance in his savings account had fallen below the $2,000.00 minimum deposit.

The following Monday, Mr. and Ms. Allen went to NationsBank and spoke to Nancy Mott, who recognized that the counter check was not written in Mr. Allen's handwriting.  Ms. Mott also informed Mr. Allen of his savings account balance, which Mr. Allen said was $900.00 to $1,000.00 short.  Ms. Mott then sent the Allens to talk to Scott Perkins, an investigator for NationsBank.

During the Allens' meeting with Scott Perkins, Mr. Perkins retrieved a savings account withdrawal slip in the amount of $970.00, which was written in the same handwriting as the counter check and which withdrew money from Mr. Allen's savings account.  Both the counter check and the savings account withdrawal slip had a nine digit number for "identification," which was identified on the documents as a Tennessee driver's license number by the notation "TDL."  However, the number did not match Mr. Allen's driver's license number, and the number contained one digit too many to be a Tennessee driver's license number.  Both documents were signed "Vernon Allen," but Mr. Allen testified that it was not his signature.  Mr. Allen executed two affidavits affirming that he did not write the two documents, authorize the writing of the two documents, or receive any benefit from the documents.

The back of each of the documents contained numbers which identified the bank in which the documents were processed, the teller who processed the documents, the date the documents were processed, and the teller transaction journal number.  From these numbers and the teller transaction journal, Mr. Perkins determined that the documents were processed back-to-back at the Inglewood branch of NationsBank at 9:08 a.m. on March 7, 1997.  The teller who processed the documents was the Defendant, Lori Little.  The documents used to withdraw money from Mr. Allen's account were blank documents available at the teller windows.

As a result of this information, Mr. Perkins ordered the videotape from that branch of NationsBank for March 7, 1997.  The relevant portions of the tape were played for the jury.  The bank uses several cameras which cycle through the multiple teller windows, recording each teller for approximately three or four seconds at intervals of approximately forty seconds.  The time shown on the tape was approximately four minutes "off," but Mr. Perkins was able to match up the transactions on the video with transactions recorded in the Defendant's teller log.  The video tape showed a customer at the Defendant's window which Mr. Perkins said matched up to transaction number 357 in the Defendant's teller log, and the tape showed another customer at the Defendant's window which Mr. Perkins said matched up to transaction number 362 in the teller log.  The tape

did not reveal any customers at the Defendant's teller window during the time transaction numbers 358 through 361 were processed. Transaction numbers 358 and 359 were the counter check and the savings account withdrawal slip involving Mr. Allen's accounts, and transaction numbers 360 and 361 were "miscellaneous cash proof," meaning that they merely documented that cash was removed from the Defendant's teller drawer. The "cash proofs" were for the same amounts as the counter check and withdrawal slip. Mr. Perkins testified that he determined from this information that "Mr. Allen was not at this window making these transactions." He did, however, admit that it would be possible for a quick transaction to be completed during the forty second cycle of the camera.

The Defendant testified on her own behalf. She denied forging the documents or taking money from Mr. Allen's accounts. She also denied knowing that Mr. Allen had any accounts at NationsBank. When asked whether she recalled anything unusual about March 7, 1997, the Defendant testified that a woman had come into the bank and gone to another person's teller window to make a transaction, but left to go check on a child in her car. The other teller asked the Defendant to process the transaction and told the Defendant that the woman would be back in a moment. The Defendant said that she waited until she saw a woman approaching the door, and then she started processing the documents. However, the woman never came to the window. The Defendant said a woman called the bank shortly thereafter and told the Defendant that she left because her child was sick and asked the Defendant if her father could pick up her money later that day. The Defendant agreed and placed the processed documents and the money in an envelope. She claimed that later that day, Vernon Allen came and picked up the money from another teller. The Defendant testified that at the time, she did not notice that the name on the documents was Vernon Allen, and she did not notice Vernon Allen enter the bank. However, after reviewing the video tape, she saw Mr. Allen on the tape at the bank that day picking up the documents.

## DENIAL OF SUBPOENA POWER

The Defendant first argues that the trial court improperly denied her the right to use the court's subpoena power. On November 12, 1998, the Defendant filed a motion for a pretrial subpoena duces tecum, asking the trial court to issue a subpoena for the production of certain documents in the custody of NationsBank   After a hearing, the trial court denied the Defendant's request, finding that most of the items on the Defendant's list were matters for discovery, not a subpoena, and that the motion was "premature."

The production of documents pursuant to a subpoena duces tecum is governed by Rule 17(c) of the Tennessee Rules of Criminal Procedure, which provides as follows:

> A subpoena may also command a person to whom it is directed to produce the books, papers, documents, or tangible things designated therein. The court, upon motion made promptly and in any event by the time specified in the subpoena for compliance therewith, may quash or modify the subpoena if compliance would be unreasonable or oppressive. . . . The court may direct that books, papers, documents or tangible things designated in the subpoena be produced before the court at a time prior to the

trial or prior to the time when they are to be offered in evidence and may upon their production permit them to be inspected by the parties and their attorneys.

This rule is essentially identical to the federal counterpart in the Federal Rules of Criminal Procedure. See Fed. R. Crim. P. 17(c). The United States Supreme Court, in addressing the federal rule, has recognized two fundamental characteristics of the subpoena duces tecum in criminal cases: "(1) it was not intended to provide a means of discovery for criminal cases, [and] (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." United States v. Nixon, 418 U.S. 683, 698-99 (1974) (citing Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951)). Further, in order to require production of documents prior to trial, the party requesting the subpoena must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

Id. at 699-700. We see no reason for the requirements for the issuance of a subpoena duces tecum to be different under our rule. See State v. Quinton Cage, No. 01C01-9605-CC-00179, 1999 WL 30595, at *8-9 (Tenn. Crim. App., Nashville, Jan. 26, 1999); State v. Woody Hutchinson, No. 887, 1990 WL 99386, at *2 (Tenn. Crim. App., Knoxville, July 19, 1990).

In her motion, the Defendant requested the production of the following items from the custody of NationsBank:

> 1. Names, addresses and telephone numbers of the coworkers present on the date when and at that branch of NationsBank where the offenses are alleged to have occurred.
> 2. Copies of all bank statements of any and all accounts of Lori Little, and all correspondence between the bank and Lori Little, or between the bank and any other party concerning Lori Little or her accounts, during and including the dates of Lori Little's employment at the bank.
> 3. Copies of all transactions from all other teller and drive through windows on the date in question from opening until 12:00 p.m., in summary form, similar to that previously provided regarding Lori Little's transactions.
> 4. Copies of all wire transfers to and/or from any and all of Lori Little's accounts or for her benefit during the dates and duration of her employment.
> 5. Copies of any and all transactions between the bank and members of the Vernon Allen family, including Mr. and Mrs. Vernon Allen and Greg Allen and Kerry Allen, on the date in question, March 7, 1997.

On November 20, 1998, during a hearing on the Defendant's motion, the trial court stated that the Defendant's first item, the names and addresses of the coworkers present that day, was a matter for discovery or a bill or particulars and not a matter for a subpoena duces tecum. The court further stated that the proper remedy if the State failed to supply the information would be for the Defendant to file a motion to compel discovery. Regarding the Defendant's item number 2 and item number 4, involving bank records pertaining to the Defendant, the trial court ruled that these were items the Defendant could obtain from the bank herself and that a subpoena duces tecum was not appropriate. With respect to item number 3, copies of all transactions from all other tellers from opening until noon, the trial court expressed concern about issuing a subpoena for bank records dealing with other bank customers and their account information and noted that federal guidelines must be followed when ordering a bank to produce such documents. The court asked for information about why the records were needed, and defense counsel responded that he wanted the documents to attempt to track the dollar amounts to determine whether the transactions in question originated from another teller window. The State responded that its proof would show that the transactions were processed on the Defendant's machine at her teller window. The trial court then maintained,

> Well, okay, there is no way I'm going to grant this motion absent some proof from somebody in charge at the bank that can tell us how the bank operates and also because, . . . you have to understand there are some very strict, and you need to get into the banking provisions about how I can order information released about bank customers, so that we can't just willy-nilly do that without some specific finding about things . . . . I mean, this is something that I'm not going to issue a subpoena duces tecum without some proof or showing that you, you know, it sounds like [you] are just a little bit premature with this.

Finally, regarding the Defendant's item number 5, copies of bank statements of Vernon Allen, his wife, and his two sons, the trial court noted that this was also a matter for discovery. In response to the Defendant's assertion that she needed the records to determine whether any amounts were redeposited into any of the Allens' accounts on that day, the trial court stated that the prosecutor could find out whether any other transactions occurred that day involving the Allens without the court ordering a subpoena, and if any other transactions did occur, "then we might cross that bridge." The court concluded, "[M]ost of the subject of this has to do with discovery or a bill or particulars. It's really not the subject, at this point, of a subpoena duces tecum. We are just a little premature, and it sounds like you all need a little further discussion."

On appeal, the Defendant does not challenge the trial court's ruling regarding the names of the other tellers; she concedes that she was able to get her own bank records through other means; and she "admits" that the trial court "appeared to 'leave the door open'" for a hearing regarding the transactions records of the other tellers. However, she asserts that the trial court improperly refused to subpoena the bank records of the Allen family. We disagree.

During the hearing on the Defendant's motion, the trial court never ruled that the Defendant could not have access to the Allens' bank statements. Instead, the trial court stated that this was a

discovery matter and that the prosecutor could find out information about the Allens' accounts and inform the Defendant of any deposits. The trial court stated that the motion for a subpoena was "premature," not that the Defendant was not entitled to the records if they were relevant. Had the Defendant attempted to glean the desired information through the discovery process and been unsuccessful, she could have filed a motion to compel discovery. See Tenn. R. Crim. P. 16(a)(1)(C), (d)(2). If that did not produce the information, a subpoena duces tecum could then have been ordered. There was no evidence that the Defendant exhausted these other routes prior to requesting the subpoena. The Defendant, by failing to show that the Allens' bank statements were "not otherwise procurable reasonably in advance of trial by exercise of due diligence," failed to show that a subpoena duces tecum was proper. See Nixon, 418 U.S. at 699. Thus, the trial court did not err by refusing to issue the subpoena.

## SUFFICIENCY OF THE EVIDENCE

The Defendant next challenges the sufficiency of the convicting evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

The Defendant was convicted of two counts of forgery. A person commits the offense of forgery when that person "forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a). "Forge" means to "[a]lter, make, complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act." Id. § 39-14-114(b). The proof at trial showed that the Defendant was working as a teller at NationsBank, and she processed

two documents which took money out of Vernon Allen's accounts.  One document was a counter check for $200.00, and the other document was a savings withdrawal slip in the amount of $970.00.  Both blank documents were available to bank tellers.  The bank video did not reveal any customers at the Defendant's teller window when the transactions were processed.  Vernon Allen testified that he did not withdraw the money or authorize the withdrawal of the money from his accounts.  He further testified that the counter check and the savings account withdrawal slip were not written in his handwriting.  From this information, a rational jury could have concluded that the Defendant forged the two documents with the intent to defraud or harm another.  Thus, the evidence was sufficient to support the convictions.

In her brief, the Defendant does not appear to truly challenge the sufficiency of the evidence.  Instead, she argues that while the proof may have established that she forged the documents with the intent to harm Vernon Allen, the proof did not establish that she forged the documents with the intent to harm NationsBank, as charged in the indictment.  Thus, the Defendant essentially argues that there was a material variance between the indictment and the proof at trial which requires reversal.

In State v. Moss, 662 S.W.2d 590 (Tenn. 1984), our supreme court set forth the test to be used in determining whether a variance between the facts alleged in the indictment and the proof established at trial requires reversal.  The court stated,

> [B]efore a variance will be held to be fatal it must be deemed to be material and prejudicial.  A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.

Id. at 592.  "A material variance occurs only if the prosecutor has attempted to rely at the trial upon theories and evidence that were not fairly embraced in the allegations made in the indictment." State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993).

> Count 1 of the indictment charged that the Defendant
> on the 7th day of March, 1997, in Davidson County, Tennessee and before the finding of this indictment, did intentionally or knowingly forge a writing described or depicted as follows:  one (1) NationsBank counter check on the account of bank customer Vernon Allen of the value of $500 or less, with the intent to defraud or harm anther, to wit:  NationsBank, in violation of Tennessee Code Annotated § 39-14-114, and against the peace and dignity of the State of Tennessee.

Count 2 of the indictment was substantially the same, except that it described the writing as "one (1) NationsBank savings withdrawal ticket on the account of bank customer Vernon Allen of the value of more than $500 but less than $1000."  The proof at trial established that the Defendant used her position as a teller at NationsBank to forge two documents withdrawing money from Vernon Allen's

accounts. Although the proof did not establish that the Defendant had a conflict with NationsBank, the proof did establish that the Defendant had a conflict with Vernon Allen's son.

Contrary to the position taken by the Defendant, we are not convinced that there was a variance between the proof at trial and the indictment. The Defendant was an employee of NationsBank who used that position to obtain the documents which she then used to withdraw money out of Mr. Allen's accounts. She took money out of the bank's cash drawer. We believe that a rational jury could have concluded from the proof that the Defendant intended to defraud or harm NationsBank as well as Mr. Allen.

Notwithstanding, assuming that there was a variance, we do not think it is material. The Defendant was informed through the indictment that she was charged with two counts of forgery for forging two documents on Vernon Allen's bank accounts. She was informed of the date of the alleged transactions and the approximate monetary value. She was informed that the transactions involved NationsBank. Thus, she was sufficiently informed of the charges against her such that she could prepare her defense and not be surprised at trial, and there is no danger that she could be prosecuted a second time for the same offense.

## JURY INSTRUCTION ON UCC

Next, the Defendant asserts that the trial court erred by instructing the jury that under the Uniform Commercial Code (UCC), "the bank is normally required to replace the funds in a customer's account which were withdrawn by the use of a forged instrument." After the proof had been presented, the Defendant renewed her motion for a judgment of acquittal, arguing that the proof did not show that the Defendant intended to defraud or harm NationsBank, as charged in the indictment. The trial court denied the motion, but the motion initiated a discussion between the attorneys and the judge regarding the liability of a bank due to forged documents. The trial court determined that it should instruct the jury that as a matter of law, the bank is liable to the customer for a forgery. Neither the State nor the Defendant objected to the instruction. In fact, defense counsel specifically stated, "I have no objection to that." On appeal, the Defendant does not argue that the jury instruction was an inaccurate statement of the law, but she asserts that the instruction "in effect lowered the bar for the state's proof, essentially instructing the jury to ignore the state's failure to prove that the defendant had intended to harm NationsBank as charged in the indictment, and to take the defendant's 'proven' intent to defraud Vernon Allen as adequate proof that the defendant intended to harm NationsBank because the U.C.C. operates in that fashion."

We see no reason to embroil ourselves in an analysis of whether the trial court erred by charging the jury on the Uniform Commercial Code, because even if error, the instruction was harmless. The party who ultimately suffered monetary loss by the Defendant's actions is irrelevant. The statute requires that the State prove the Defendant forged a document with the intent to harm or defraud another. See Tenn. Code Ann. § 39-14-114(a). The statute does not require any monetary loss, or even any actual harm. See id. Thus, it is the Defendant's intent which is material, not who was actually harmed. The jury was properly instructed on the elements of the offense. We have

already determined that the jury could have reasonably found that the Defendant intended to harm or defraud both NationsBank and Vernon Allen. Accordingly, we hold that any error in the instruction was harmless.

## LIMITATION OF CROSS-EXAMINATION

The Defendant asserts that the trial court improperly limited her cross-examination of Scott Perkins regarding his bias and hostility towards her. Scott Perkins was the investigator for NationsBank who testified for the State. During cross-examination, defense counsel questioned Mr. Perkins about any possible deficiencies in his investigation. Mr. Perkins was asked whether he had made any further inquiries into the matter after he had decided that the Defendant was the person who committed the forgeries, and he said that he did not. Defense counsel then asked Mr. Perkins, "Do you want to see Ms. Little convicted?" Mr. Perkins replied, "I don't have anything against her." Defense counsel then again asked the same question, at which point the State objected to the relevancy of the question, and the trial court sustained the objection. This was the only limitation of the Defendant's cross-examination, but she argues that the question should have been allowed to show Mr. Perkins' bias against the Defendant.

The admissibility of evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). We find no abuse of discretion by the trial court in sustaining the objection to the question of whether Mr. Perkins wanted to see the Defendant convicted. The trial court did not foreclose the opportunity for the Defendant to ask questions concerning any bias on the part of Mr. Perkins; it just prevented one question which it found to be irrelevant. This issue has no merit.

## CONTACT WITH JUROR

The Defendant argues that the trial court should have granted a mistrial because of contact between a witness and a juror. On the morning of the second day of the trial, outside the presence of the jury, defense counsel announced to the court that a witness, Maria Harris, was in the hall. Defense counsel then continued:

> She was apparently originally subpoenaed by the State. I have asked her to be here to testify should we call her today. She was on, I guess, on call. And she didn't make it in until yesterday until after the jury was seated. She's apparently a friend of Carol Welch, juror number 6. And they spoke in the hall yesterday when Ms. Harris arrived during a break.
>
> Now Ms. Harris said they didn't speak about the case, and as well, she even thought she was in the courtroom across the hall. I just bring this to the Court's

attention. I don't think we have an issue with it. I just bring it to the Court's attention.[1]

The trial court acknowledged defense counsel's statements and then moved on to other issues. Apparently, none of the involved parties felt that the juror contact was a problem at the time. However, the Defendant now argues that the contact necessitated a mistrial.[2]

The decision of whether to grant a mistrial is a matter within the discretion of the trial court, and we will not disturb the trial court's action on appeal absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Generally, a mistrial will only be declared "if there is a manifest necessity requiring such action by the trial judge." Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared." Id.

We find no "manifest necessity" for a mistrial in this case. There is no evidence that Ms. Harris' alleged contact with a juror influenced or prejudiced the jury in any way. The Defendant was the one to bring the contact to the court's attention, and her attorney's comments indicated that the contact did not prejudice the jury. Thus, we find no error in failing to grant a mistrial.

## INTIMIDATION OF DEFENDANT

Finally, the Defendant argues that the trial court improperly intimidated her during direct examination. She asserts that the trial court interrupted her "essentially in midsentence and excused the jury with both startling and stunning effect," that the trial court threatened her, and that the "entire sequence, the trial court's interruption, the removal of the jury, the threat to the defendant, the return of the jury, and her following testimony in a meeker tone surely alerted the jury to the trial court's prejudice and shaded their opinion of the defendant."

While testifying about how she was not "trying to condemn the Allens," the Defendant added, "I'm very concerned about getting a fair trial and I've made that very clear all along. I have not been able to obtain certain information. Things have been kept out of my hands --." The trial court sustained the State's objection to the Defendant's statements. Later, while defense counsel was attempting to authenticate a copy of the video from the bank which the defense wanted to play for the jury, the Defendant said,

I've gone to see Mr. Roark before with copies that have been given to us by NationsBank . . . , those copies have been corrupt. They were not readable copies. Mr. Roark has determined that they were either copied on a machine that had a bad

---

[1] The trial transcript attributes these statements to "THE COURT," but from the context and the statements in the briefs of both the State and the Defendant, we conclude that the statements were actually made by defense counsel.

[2] Although we address this issue on the merits, we also find that the Defendant waived consideration of this issue on appeal by her failure to request a mistrial or otherwise object to the juror contact. See Tenn. R. App. P. 36(a).

head or that the original had been corrupted prior to handing us over a copy. That happened twice. We first requested a copy a year ago.

The trial court interrupted, "Excuse me, Mr. Reed [defense counsel]. This is not responsive to your question. I take it you're trying to lay a foundation for this. . . . Let's do that." After more of a foundation had been laid, the State objected to the use of the Defendant's video because the original had already been introduced into evidence and played for the jury. The Defendant volunteered, "He would like to keep this out of evidence because there is no machine to play it [the State's exhibit] on." At this point, the trial court <u>sua sponte</u> excused the jury, and the following colloquy occurred:

> THE COURT: Now, Ms. Little, you've testified under oath that you were a law enforcement officer.[3] Have you ever testified in court before?
> THE WITNESS: Yes, sir, I have many times.
> THE COURT: Well, I don't know what they do in Oklahoma, but you go off here and you're going to find yourself in a strange irony where you're going to end up doing more time for contempt than if you got convicted for these underlying crimes.
>    So you answer the questions that your lawyer asks. And if you are actually a law enforcement officer, you know better than to try to put these little zingers in.
>    How long were you a law enforcement officer?
> THE WITNESS: Three and a half years, sir.
> THE COURT: You're telling me that those Oklahoma judges let you put in these little zingers when you testify in front of a jury in Oklahoma?
> THE WITNESS: I had no need to, sir.
> THE COURT: Well, then forget the zingers here and let's just stick to the facts.

The court then brought the jury back in and resumed the trial.

"'The propriety, scope, manner, and control of the examination of witnesses is a matter within the discretion of the trial judge, which will not be interfered with in the absence of an abuse thereof.'" <u>State v. Meeks</u>, 876 S.W.2d 121, 128 (Tenn. Crim. App. 1993) (quoting <u>Coffee v. State</u>, 216 S.W.2d 702, 703 (Tenn. 1948)); <u>see also</u> Tenn. R. Evid. 611. We find no abuse of discretion on the part of the trial judge by his admonitions to the Defendant. On three occasions, the Defendant made comments that were either unresponsive to questions asked or inappropriate. She was purposefully expressing her displeasure with the proceedings against her. Informing the witness to answer the questions asked was a proper exercise of the court's power to control the examination of witnesses. <u>See id.</u> Had the trial court made his admonitions in the presence of the jury, his comments could have prejudiced the jury against the Defendant. <u>See</u> <u>State v. Eaves</u>, 959 S.W.2d 601, 604-05 (Tenn. Crim. App. 1997) (holding statements of trial judge in presence of jury warning the defendant of the potential for an aggravated perjury charge constituted reversible error). However, the trial judge in this case excused the jury before warning the Defendant to control her "zingers." Also, the record does not support the Defendant's assertion that her answers to questions after the admonition were "meeker." Granted, we are relying only on a written record for our

---

[3]The Defendant had testified that she had been a law enforcement officer for three and half years in Oklahoma.

interpretation, but we can find no evidence that the Defendant's demeanor significantly changed. While she may have refrained from inserting as many "zingers" in her testimony, the Defendant's answers to questions asked were long and detailed. She did not hesitate to contradict the assertions made by the State on cross-examination and to supply her own explanation of events. Her answers were still assertive. We find nothing in the record which evinces prejudice to the Defendant due to the trial court's admonition. This issue has no merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE